

# IN THE
# TENTH COURT OF APPEALS

_____

## No. 10-12-00393-CV

## IN RE NORRIS KINRICK AUTHER ALEXIS

_____

## Original Proceeding

_____

## MEMORANDUM  OPINION

_____

Relator, Norris Kinrick Auther Alexis, requests habeas-corpus relief from a July 25, 2012 order holding him in contempt and ordering his commitment to county jail for a period not to exceed 180 days.  We modify the order as set forth below, and we deny relator's requested relief in all other respects.

### I.    BACKGROUND

On February 1, 2010, Quillia Alexis filed her original petition for divorce.  On the same day as the filing, the trial court entered a temporary restraining order, enjoining relator from, among other things, "[d]estroying, removing, concealing, encumbering, transferring, or otherwise harming or reducing the value of the property of one or both

of the parties"; damaging, tampering, or destroying the tangible property of one or both of the parties; selling, transferring, assigning, mortgaging, encumbering, or alienating any property; opening or diverting Quillia's mail; and operating or exercising control over the couple's 1997 Mercedes E-320 or 2001 Mercedes SLK-320 motor vehicles.

Subsequently, the trial court entered temporary orders requiring relator to pay, among other things, the monthly mortgage debt service on the couple's house. In addition, the trial court ordered that Quillia have exclusive and private use and possession of a 1950 Chevrolet Deluxe motor vehicle, the 2001 Mercedes SLK-320, a 2000 BMW 740i motor vehicle, and the mineral-rights income associated with the couple's property. On the other hand, relator was granted exclusive use and possession of the 1997 Mercedes E320, a 2000 Ford F350 motor vehicle, a 1936 Plymouth Coupe motor vehicle, and the couple's house. The trial court's temporary orders also included a temporary injunction, much of which mirrored the previously-granted temporary restraining order.

Thereafter, Quillia filed a motion for enforcement, alleging that relator violated numerous provisions of the trial court's temporary orders and, thus, was in contempt of court. Specifically, Quillia asserted that relator: (1) failed to pay $2,400 in spousal maintenance; (2) failed to give her possession of the 2000 BMW 740i, which relator allegedly totaled and kept the $9,363.05 in insurance proceeds; (3) incurred $2,500 in debt on services to be performed on the 1950 Chevrolet Deluxe and failed to pay the debt; (4) incurred $3,600 in debt for services to be performed on the 1936 Plymouth Coupe and failed to pay the debt; and (5) failed to pay $6,039.52 in past-due mortgage

payments, $470.90 in past-due insurance, $3,878.37 in past-due property taxes, and $592.96 in past-due utility bills. Quillia also asserted that relator transferred, assigned, sold, or destroyed numerous other property contained in the marital estate, resulting in a significant reduction of the community property. In addition, Quillia contended that relator diverted her mail and took possession of an IRS "innocent spouse" refund check made out to her in the amount of $531.00.

A hearing on Quillia's motion for enforcement was set, and the trial court began hearing testimony on the motion on May 30, 2012. The hearings on Quillia's motion took place on May 30, 2012; June 6, 2012; June 22, 2012; and July 25, 2012. At each of these hearings, relator was represented by attorney, Ricardo De Los Santos. Prior to the first hearing, De Los Santos mailed a letter to the trial court indicating that he was representing relator "for the limited purpose of this hearing . . . on a Pro-Bono basis." De Los Santos also stated that relator agreed to the limited representation. The Reporter's Record demonstrates that De Los Santos actively participated in the hearings by questioning witnesses, making objections, and proffering evidence.[1]

However, it appears that relator filed a pro se motion for enforcement against Quillia. On July 25, 2012, the trial court, after hearing Quillia's motion for enforcement, conducted a hearing on relator's motion. For this motion, relator advanced pro se.

At the conclusion of the hearings, the trial court concluded that relator had violated numerous court orders and that he had the ability to comply. As a result, the

---

[1] In particular, De Los Santos informed the trial court that he was representing Alexis solely regarding the "allegations of the contempt." Further, Alexis admitted at the hearings that he has had three previous attorneys work on this case on his behalf.

trial court held relator in contempt for each violation and ordered that he be confined in the Johnson County jail for a period not to exceed 180 days. The trial court also ordered that relator pay $21,140.90 in attorney's fees, expenses, and costs to Quillia's attorney and $10,981.75 to reimburse Quillia for the "innocent spouse" check and past due mortgage, insurance, taxes, and utility bills incurred while he had exclusive possession of the couple's house. Finally, the trial court ordered that relator "not be given good conduct time credit for time spent in the county jail."[2] On October 29, 2012, relator filed this petition for writ of habeas corpus.

## II. ANALYSIS

In support of his habeas petition, relator raises six issues. Specifically, relator argues that: (1) the contempt order and subsequent incarceration violates his due-process rights because he was not given notice of his right against self-incrimination, right to a jury, and right to court-appointed counsel; (2) his due-process rights were violated because the contempt order denied him good-time credit; (3) the temporary orders upon which the contempt order is based were not specific enough; and (4) the order of contempt and incarceration was based on the performance of an impossible act.

Relator's original habeas-corpus proceeding in this Court is a collateral attack on the contempt order. *In re Marks*, 365 S.W.3d 843, 844 (Tex. App.—Fort Worth 2012, orig. proceeding). The purpose of the proceeding is to determine whether the contemnor was afforded due process of law or if the order of contempt is void. *See Ex parte Casillas*,

---

[2] At the May 30, 2012 hearing, Quillia testified that Alexis had pleaded guilty in Tarrant County, Texas, to molesting a child.

25 S.W.3d 296, 298 (Tex. App.—San Antonio 2000, orig. proceeding). A court will issue a writ of habeas corpus if the order underlying the contempt is void or if the contempt order itself is void. *Id.* "A contempt order is void if it is beyond the power of the court to enter it, or if it deprives the relator of liberty without due process of law." *Id.* at 298-99. When collaterally attacked in a habeas-corpus proceeding, a judgment is presumed valid until the relator has discharged his burden showing otherwise. *In re Marks*, 365 S.W.3d at 844-45.

## A.    Self-Incrimination

The record reflects that relator was represented by counsel at all of the hearings on Quillia's motion for enforcement—the operative motion in this case that resulted in relator's incarceration. Further, the Texas Court of Criminal Appeals has held that "when an accused voluntarily takes the stand he waives his privilege against self-incrimination at the hearing at which he takes the stand." *Hernandez v. State*, 506 S.W.2d 884, 886 (Tex. Crim. App. 1974); *see Ex parte Tankersley*, 650 S.W.2d 550, 551 (Tex. App.—Fort Worth 1983, writ ref'd n.r.e.) (holding that relator waived his claim against self-incrimination when neither he nor his attorney asserted it in the trial court). When a defendant, represented by counsel, takes the stand to testify in his or her own defense, that act is understood to have been undertaken voluntarily and with full knowledge of his or her rights. *Mullane v. State*, 475 S.W.2d 924, 926 (Tex. Crim. App. 1971). Thus, we conclude that relator waived any privilege against self-incrimination that he had under the Fifth Amendment of the United States Constitution when his counsel put him on the stand to testify and when neither he nor his attorney claimed the privilege in the trial

court.  *See Ex parte Tankersley*, 650 S.W.2d at 551; *see also In re Corder*, 332 S.W.3d 498, 501 (Tex. App.—Houston [1st Dist.] 2009, orig. proceeding).

## B.     Right to a Jury Trial

Although an absolute right to trial by jury in contempt proceedings does not exist, an alleged contemnor possesses such a right in criminal contempt cases in which the punishment assessed is "serious."  *See Muniz v. Hoffman*, 422 U.S. 454, 475-77, 95 S. Ct. 2178, 2190-91, 45 L. Ed. 2d 319 (1975); *Ex parte Griffin*, 682 S.W.2d 261, 262 (Tex. 1984) (orig. proceeding); *In re Newby*, 370 S.W.3d 463, 466 (Tex. App.—Fort Worth 2012, orig. proceeding).  Punishment assessed for criminal contempt beyond 180 days is considered "serious" and may not be assessed unless there was a jury trial or a jury waiver.  *Ex parte Sproull*, 815 S.W.2d 250, 250 (Tex. 1991) (orig. proceeding); *In re Newby*, 370 S.W.3d at 466.  Section 21.002(b) of the Texas Government Code provides that punishment for a single act of contempt of court is a fine of not more than $500 or confinement in the county jail for not more than six months or both.  TEX. GOV'T CODE ANN. § 21.002(b) (West 2004).  Punishment within these limits is characterized as "petty."  *See Ex parte Werblud*, 536 S.W.2d at 547; *In re Newby*, 370 S.W.3d at 466.

Relator asserts that he was entitled to notice of his right to a jury trial because Quillia's enforcement motion requested that the trial court hold him in contempt for seventy-six violations of the underlying temporary orders and each violation subjected him to imprisonment of up to 180 days.  Accordingly, relator argues that this demonstrates a possibility that the trial court would assess "serious" punishment.  However, the trial court's contempt order clearly states that "[a] jury was waived"; that

relator is in contempt for each of the separate violations mentioned in the order; and that relator should be confined in the Johnson County jail for a period not to exceed 180 days.

We find the portion of the trial court's order indicating that relator waived his right to a jury to be noteworthy. This finding connotes that relator was provided notice of his right to a jury and voluntarily waived that right. The fact that relator was represented by counsel at all of the relevant enforcement hearings supports the trial court's finding. Moreover, cases of criminal contempt in which the sentence *actually imposed* does not exceed six months' imprisonment, as is the case here, are exempt from the requirements of a jury trial. *See Taylor v. Hayes*, 418 U.S. 488, 495-96, 94 S. Ct. 2697, 2702, 41 L. Ed. 2d 897 (1974); *Ex parte Werblud*, 536 S.W.2d at 547. Accordingly, we do not believe that relator has discharged his burden in showing that the trial court violated his due-process rights with regard to his perceived right to a jury trial.

## C.     Right to Appointed Counsel

Here, it does not appear that the trial court advised relator of his right to appointed counsel. However, we do not believe that such an instruction was necessary considering attorney De Los Santos agreed to handle relator's case on a pro-bono basis with relator's consent. As such, we cannot say that relator's due-process rights were violated with regard to his right to counsel. Accordingly, we overrule relator's first three issues.

### D. Good-Conduct Time Credit

In his fourth issue, relator argues that the trial court had no authority to limit the operation of good-conduct time credit. The Texas Code of Criminal Procedure provides that:

> The sheriff in charge of each county jail may grant commutation of time for good conduct, industry, and obedience. A deduction not to exceed one day for each day of the original sentence actually served may be made for the term or terms of sentences if a charge of misconduct has not been sustained against the defendant.

TEX. CODE CRIM. PROC. ANN. art. 42.032, § 2 (West Supp. 2012). Both the Texas Supreme Court and the Texas Court of Criminal Appeals have held that good-conduct time credit is available to one serving a sentence for contempt. *See Ex parte Roosth*, 881 S.W.2d 300, 301 (Tex. 1994) (orig. proceeding); *Ex parte Acly*, 711 S.W.2d 627, 628 (Tex. 1986) (orig. proceeding); *see also Ex parte Daniels*, 722 S.W.2d 707, 711-12 (Tex. Crim. App. 1987) (orig. proceeding); *Kopeski v. Martin*, 629 S.W.2d 743, 745 (Tex. Crim. App. 1982) (orig. proceeding). "The trial court does not have the authority to restrict a sheriff's discretion concerning the granting of good-conduct time." *Jones v. State*, 176 S.W.3d 47, 52 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

Because relator was taken into custody under an order holding him in contempt, he is eligible for good-conduct time credit. *See In re Davis*, 305 S.W.3d 326, 333 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding) (citing TEX. CODE CRIM. PROC. ANN. art. 42.032; *Ex parte Daniels*, 722 S.W.2d at 711-12; *Ex parte Suter*, 920 S.W.2d 685, 687 n.1 (Tex. App.—Houston [1st Dist.] 1995, orig. proceeding)). Accordingly, we hold that the portion of the trial court's contempt order withholding good-conduct time credit is

void. But, if a severable portion of a contempt or commitment order is void, an appellate court may strike the offending portion and deny relief as to the valid portion of the order. *See In re Zapata*, 129 S.W.3d 775, 780-81 (Tex. App.—Fort Worth 2004, orig. proceeding) (citing *Ex parte Roosth*, 881 S.W.2d at 301); *In re Patillo*, 32 S.W.3d 907, 909 (Tex. App.—Corpus Christi 2000, orig. proceeding); *see also In re Durant*, No. 02-09-00079-CV, 2009 Tex. App. LEXIS 7203, at *7 (Tex. App.—Fort Worth Sept. 10, 2009, orig. proceeding) (mem. op.). We therefore modify the portion of the contempt order denying relator the opportunity for "good conduct time credit for time spent in the county jail." *See Ex parte Roosth*, 881 S.W.2d at 301; *In re Davis*, 305 S.W.3d at 333; *In re Zapata*, 129 S.W.3d at 780-81. Accordingly, we sustain relator's fourth issue pertaining to good-conduct time credit.

**E.      The Specificity of the Trial Court's Temporary Orders**

In his fifth issue, relator argues that his due-process rights were violated because the trial court held him in contempt based on an order that was not sufficiently clear and specific. Specifically, relator asserts that the trial court's temporary orders were vague because they ordered him not to encumber marital property but allowed him to make expenditures for everyday living expenses and reasonable attorney's fees. Relator states that he was forced to encumber marital property to pay for everyday living expenses because he lost his job.

The Texas Supreme Court has stated that: "To be enforceable by contempt, a decree must 'set forth the terms of compliance in clear, specific[,] and unambiguous terms so that the person charged with obeying the decree will readily know exactly

what duties and obligations are imposed upon him.'" *Ex parte Acker*, 949 S.W.2d 314, 317 (Tex. 1997) (quoting *Ex parte Chambers*, 898 S.W.2d 257, 260 (Tex. 1995)). Interpretation of the order should not rest on implication or conjecture. *Id.*

> "Where the court seeks to punish . . . by imprisonment for the disobedience of an order or command, such order or command must carry with it no uncertainty, and must not be susceptible of different meanings or construction, but must be in the form of a command, and, when tested by itself, must speak definitely the meaning and purpose of the court in ordering."

*Ex parte Slavin*, 412 S.W.2d 43, 45 (Tex. 1967) (quoting *Ex parte Duncan*, 42 Tex. Crim. 661, 62 S.W. 758, 760 (Tex. Crim. App. 1901); *see Ex parte Glover*, 701 S.W.2d 639, 640 (Tex. 1985). Only the existence of reasonable, alternative constructions will prevent the enforcement of the order. *Ex parte Chambers*, 898 S.W.2d at 260.

Here, the trial court's temporary orders stated that relator is authorized: (1) "To make expenditures and incur indebtedness for reasonable and necessary living expenses for food, clothing, shelter, transportation, and medical care"; and (2) "To make expenditures and incur indebtedness for reasonable attorney's fees and expenses in connection with this suit." The temporary orders also required relator to provide Quillia with "exclusive and private use and possession" of the 1950 Chevrolet Deluxe, the 2001 Mercedes SLK-320, the 2000 BMW 740i, and the mineral-rights income from the couple's property. In addition, relator was specifically enjoined from, among other things, damaging or destroying the couple's tangible property; selling, transferring, assigning, mortgaging, encumbering, or alienating any of the couple's property; and opening or diverting mail addressed to the other party. Irrespective of the fact that

relator lost his job on account of his own criminal act, nowhere in the temporary orders is relator authorized to encumber the couple's community property for his own living expenses.

We do not find relator's insistence that the trial court's temporary orders authorized him to encumber, sell, or destroy the couple's community property to pay his living expenses to be persuasive. In fact, one of the purposes of the temporary orders was to maintain the status quo so that the trial court could divide the couple's property in a just and right manner at the trial on the merits. *See* TEX. FAM. CODE ANN. § 6.502 (West 2006) (providing that, while a suit for the dissolution of a marriage is pending, the trial court may grant "a temporary injunction for the preservation of the property and the protection of the parties as deemed necessary and equitable"); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (noting that the purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits). However, relator admitted that he took out loans on the couple's property, including that which was ordered to be turned over to Quillia. In addition, relator admitted to opening mail addressed to Quillia and selling items that were arguably a part of the marital estate. Each of these acts clearly violated the trial court's temporary orders.

We believe that the trial court's temporary orders are sufficiently clear, specific, and unambiguous. *See Ex parte Acker*, 949 S.W.2d at 317; *Ex parte Chambers*, 898 S.W.2d at 260; *see also Ex parte Slavin*, 412 S.W.2d at 45. Accordingly, we cannot say that relator was unaware of the duties and obligations imposed upon him to a degree that the

orders were not enforceable by contempt. *See Ex parte Acker*, 949 S.W.2d at 317; *Ex parte Chambers*, 898 S.W.2d at 260; *see also Ex parte Slavin*, 412 S.W.2d at 45. As such, we overrule relator's fifth issue.

## F. Impossible Act

In his sixth issue, relator contends that the trial court's temporary orders required him to make certain payments that he could not make because he had lost his job and he pleaded guilty to a criminal allegation. Relator argues, without citing any authority, that the trial court's contempt order is void because the underlying temporary orders required him to perform an impossible act. We disagree.

Pursuant to the trial court's temporary orders, relator was required to not only make payments but also turn over several pieces of property to Quillia. In addition, relator was enjoined from doing many things, including diverting Quillia's mail and diminishing the value of the community property. Therefore, regardless of relator's ability to make the required payments, the record demonstrates that relator refused to turn over property to Quillia; that he diminished the value of the community property; and that he diverted Quillia's mail. Because the trial court's contempt order can be supported on other grounds, we do not find that relator's alleged inability to pay, if true, somehow renders the entire contempt order void. *See, e.g., Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766 (Tex. 2011) (per curiam) ("In the absence of findings of fact or conclusions of law, a trial court's judgment will be upheld on any theory supported by the record . . . and any necessary findings of fact will be implied."); *Lopez v. Hansen*, 947

S.W.2d 587, 589 (Tex. App.—Houston [1st Dist.] 1997, no writ) (same). As such, we overrule relator's sixth issue.

### III. CONCLUSION

Because we conclude that the trial court's contempt order is void only to the extent that it withholds good-conduct time credit, we modify the order by deleting the portion denying relator the opportunity for "good conduct time credit for time spent in the county jail." In all other respects, we deny relator habeas relief.


AL SCOGGINS
Justice


Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Modified and denied
Opinion delivered and filed December 6, 2012
[CV06]